UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Rashaun Nicole Stagg-Shehadeh, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action H-18-4775 |
| | § | |
| LPM Manufacturing, Inc. et al., | § | |
| Defendants. | § | |

## Report and Recommendation on Motion to Exclude Expert Witness and Motion for Summary Judgment

Rashaun Nicole Stagg-Shehadeh sued LPM Manufacturing, Inc., Leslie's Poolmart, Inc., and M&M Industries, Inc., asserting products liability, negligence, and breach of implied warranty claims related to their production and sale of buckets of unwrapped chlorine tablets. (D.E. 1; D.E. 9.) The parties agreed to dismiss M&M Industries, Inc., and the court granted partial dismissal. (D.E. 30; D.E. 31.) The remaining Defendants move to exclude the testimony of Ms. Stagg-Shehadeh's expert witness and move for summary judgment. (D.E. 32; D.E. 33.) The court grants the motion to exclude in part and recommends that the motion for summary judgment be granted.

### 1. Background

Plaintiff Rashaun Nicole Stagg-Shehadeh alleges that, on the evening of June 7, 2017, she was sweeping up debris on her back patio when she was injured by Defendants' bucket of unwrapped chlorine tablets. (D.E. 34-2 at 9–10.) That morning, Ms. Stagg-Shehadeh's husband, Fadi Shehadeh, moved the bucket of unwrapped chlorine tablets from the garage to the patio near the pool. (D.E. 33-4 at 6.) He introduced several chlorine tablets to the pool around 8:00 or 8:30 a.m. just before heading to work. *Id.* After introducing the tablets, Mr. Shehadeh closed the bucket, hearing the click that told him the lid was secure. *Id.* at 9. He left the bucket on the patio pushed up to the

wall, intending to put it back in the garage when he returned home from work. *Id.* at 7–9, 11. The bucket was still on the back patio when Ms. Stagg-Shehadeh was sweeping so she reached down to move it out of her way. (D.E. 34-2 at 10.) When she touched the handle, the top of the bucket flew off and hit her in the face. *Id.* at 13–15, 18. The next thing Ms. Stagg-Shehadeh remembered was being on the ground. *Id.* at 15. She got into the house and dialed 911. *Id.* at 15–16. Ms. Stagg-Shehadeh took an ambulance to the hospital, where she was treated for facial lacerations and two fractures. (D.E. 34-2 at 6; D.E. 34-3 at 3.)

On November 19, 2018, Ms. Stagg-Shehadeh sued Defendants LPM Manufacturing, Inc., and Leslie's Poolmart, Inc., (Leslie's)[1] in Texas state court, asserting claims related to Defendants' production of the bucket of unwrapped chlorine tablets. (D.E. 1-2.) Defendants timely removed the case to federal court. (D.E. 1.) Ms. Stagg-Shehadeh later amended her complaint. (D.E. 9.) In her amended complaint, Ms. Stagg-Shehadeh asserts several claims against Defendants falling into these broad categories: failure to warn; design defect; manufacturing defect; negligence; and breach of implied warranty. *Id.*

LPM Manufacturing, Inc., forms and packages three-inch chlorine tablets, which Leslie's sells in twenty- to fifty-pound buckets through their retail stores and website. (D.E. 32-2 ¶ 3.) Leslie's Director of Safety and Regulatory Affairs testified that buckets sold online contain chlorine tablets that are individually wrapped due to Department of Transportation shipping regulations. (D.E. 32-3 at 3.) Leslie's Vice President of Risk Management affirmed that customers frequently complain about the extra handling and waste produced by the individual wrappings. (D.E. 32-2 ¶ 5.) Thus, the buckets sold in retail stores generally contain unwrapped chlorine tablets. *Id.* The representative affirmed that both wrapped and unwrapped chlorine tablets are standard industry offerings. *Id.*

---

[1] M&M Industries, Inc., was also named as a Defendant in the original lawsuit but has since been dismissed. (D.E. 31.)

Leslie's Director of Safety and Regulatory Affairs affirmed that the Environmental Protection Agency (EPA) regulates the sale and distribution of the chlorine tablets because they are a pesticide registered under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). (D.E. 32-5 ¶ 2.) The chlorine tablets that Leslie's sells have been registered with the EPA since 1979. *Id.* ¶ 4. If Leslie's wants to change the labeling on any of its products, it submits its proposed changes to the EPA per EPA requirements. (D.E. 32-3 at 4.) Packaging labels on buckets of chlorine tablets show a warning on the front that reads "DANGER" and states that additional precautions are listed on the back panel. (D.E. 32-4.) Those precautions include in part:

> . . . Strong oxidizing agent. Do not mix with other chemicals. Never add water to product. Always add product to large quantities of water. Use only clean, dry utensils. Do not add this product to any dispensing device containing remnants of any other product. Such use may cause a violent reaction leading to fire or explosion. Contamination with moisture, organic material or other chemicals may start a chemical reaction with generation of heat, liberation of hazardous gases and possible fire or explosion . . . .
> . . . .
> . . . STORAGE: Keep product dry in its original, tightly closed container when not in use. Store container in a cool, dry, well-ventilated area away from heat or open flame. Storage area should be locked and inaccessible to children.

*Id.*

Mr. Shehadeh testified that, between 2010 and 2017, he would purchase a bucket of chlorine tablets from Defendants' retail store generally every three to four weeks. (D.E. 33-4 at 3.) Mr. Shehadeh stored one bucket at a time in the family's two-car garage against a wall, one foot above the floor, on a metal rail. *Id.* at 4. He testified that each bucket was fairly heavy, so he was always the one to handle it and only moved it if he needed it. *Id.* at 5, 11. Mr. Shehadeh testified that between 2010 and 2017, he had left a bucket of chlorine tablets on the patio by the pool no more than ten times. *Id.* at 7.

## 2. Expert Testimony

Ms. Stagg-Shehadeh hired David Smith as an expert witness to testify about the cause of the incident. (D.E. 36-1 at 16.)[2] Smith testified that he provides expert testing and consultation for fire and explosion causation and thermal dynamics. *Id.* at 6. In this case, Smith produced an expert report wherein he opined that: (1) water in the bucket of unwrapped chlorine tablets reacted with the chlorine and caused the incident; (2) the incident would not have occurred if the chlorine tablets inside the subject bucket were individually wrapped; and (3) Defendants did not sufficiently warn consumers against the mechanisms of an overpressure event. (D.E. 34-5 at 4–5.) In reaching his opinions, Smith reviewed Ms. Stagg-Shehadeh's deposition and the depositions of two corporate officers, along with photographs and pleadings. *Id.* at 4. Smith was able to observe and test the subject bucket with unwrapped chlorine tablets in 2019. (D.E. 36-1 at 25.) Smith affirmed that he utilized the National Fire Protection Association (NFPA) industry standards to form his opinions. (D.E. 35-3 ¶¶ 10–11.)

As to causation, Smith hypothesized that water or organic material like leaves, grass, pollen, or dust entered into the interior of the bucket. (D.E. 36-1 at 104.) He theorized that the water or organic material mixed with the unwrapped chlorine tablets and produced a gas, which was confined inside the bucket. (D.E. 34-5 at 6–7.) Smith explained that, when gas is confined, the pressure it causes would rupture its place of confinement to allow for the equalization of inside and outside pressure. *Id.* Smith testified that he did not observe remnants of charred or dehydrated organic material inside the bucket. (D.E. 36-1 at 104.) He testified that if water had been poured onto the chlorine tablets, he would have expected the tablets to appear melted. *Id.* He did not observe any tablets that looked melted. *Id.* He also observed a foreign material on six of the chlorine tablets. (D.E. 34-5 at 5.) The laboratory could not determine what the substance was but

---

[2] Docket entry 36-1 is a copy of Smith's full deposition. Excerpts of his deposition were attached elsewhere. (D.E. 32-6; D.E. 33-2.)

found that it was consistent with blood. (D.E. 36-1 at 52.) Based on these observations, Smith eliminated organic material and external water as potential oxidizers. (D.E. 36-1 at 104; D.E. 35-3 ¶ 38.)

After eliminating his original hypotheses, Smith opined that water vapor must have entered into the bucket and reacted with the unwrapped chlorine tablets to cause the incident. (D.E. 35-3 ¶ 24.) Smith vacillates between blaming the reaction on liquid water formed by condensation and simply water vapor present in the humid Houston air. (D.E. 35-3 ¶¶ 39, 41; D.E. 36-1 at 34, 35, 61, 82, 104.) He tested both the subject bucket and an exemplar bucket to determine whether the buckets were airtight while the lid was in place. (D.E. 36-1 at 24–26.) Smith determined that the buckets were not airtight and thus affirmed that water vapor could have entered the closed bucket. (D.E. 35-3 ¶ 39.)

As to the design of the product, Smith opined that selling buckets of unwrapped chlorine tablets was unreasonably dangerous. (D.E. 34-5 at 4–5.) He believed that individually wrapping the chlorine tablets was a cheaper, safer alternative. (D.E. 36-1 at 55, 60.) Smith did not perform any tests with individually wrapped chlorine tablets. *Id.* at 60. His "opinion was predicated on training and experience in other cases involving hazardous materials." *Id.* at 56. "It was an assumption on [his] part." *Id.* Smith did not offer any opinions on the design or production of the bucket. *Id.* at 43.

As to the warning label, Smith opined that Defendants "did not sufficiently warn against the mechanisms of the overpressure event." (D.E. 34-5 at 5.) Specifically he testified that the bucket should have warned that if liquid were introduced, the bucket may explode or rupture and cause personal injury. (D.E. 36-1 at 70, 109, 116.)

### 3. Motions

Defendants now move for summary judgment and to exclude Smith's expert testimony. (D.E. 32; D.E. 33.) Attached to the motions, Defendants provided deposition excerpts, a copy of the NFPA Guide that Smith referenced in his expert report, and a copy of the packaging label affixed to Defendants' buckets of chlorine tablets. Defendants did not attach Smith's expert report. In her responsive filings,

Ms. Stagg-Shehadeh attached Smith's expert report and affidavit. (D.E. 34-5; D.E. 35-3.) Defendants objected to Smith's affidavit on the grounds of hearsay and the sham affidavit doctrine. (D.E. 37.) The court held a hearing on Defendants' motions and the parties stated that live witnesses were unnecessary. The court ordered the parties to brief the sham affidavit doctrine, which they did. (D.E. 42; D.E. 43; D.E. 44.)

The court considers Defendants' objections, motion to exclude, and motion for summary judgment.

### 4. Objections to Expert Affidavit and Expert Report

Defendants argue that Smith's report and affidavit are inadmissible because his expert report contains hearsay and his affidavit is unsigned. However, "[a]t the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c)). Federal Rule of Evidence 56(c) "permits a party to support or dispute summary judgment through unsworn declarations, provided their content can be presented in admissible form at trial." *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746–47 (5th Cir. 2019) ("Consequently, we will consider Patel's expert reports in determining whether Defendants were entitled to summary judgment."). Defendants' objections as to the admissibility of the expert report and affidavit are denied on the basis that they need not be presented in admissible form at this stage.

Defendants also argue that Smith's affidavit constitutes a sham affidavit, because it directly contradicts Smith's deposition testimony. "Under the sham affidavit doctrine, a district court may refuse to consider statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'" *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019). The doctrine prevents parties from defeating summary judgment with an affidavit that inexplicably impeaches sworn testimony. *Robinson v. Nexion Health At Terrell, Inc.*, 671 F. App'x 344, 344 (5th Cir. 2016). It does not exclude affidavits that can be reconciled with sworn testimony. *Winzer*, 916 F.3d at 473.

Defendants highlight a few inconsistencies between Smith's deposition testimony and Smith's affidavit. The court does not find any of these examples to be so markedly inconsistent as to constitute a sham. For example, Defendants assert that "in the affidavit Smith claims he excluded alternative causes (i.e. actual water entering the bucket) yet in his deposition testimony, he admitted that he did not examine the bucket post-incident." (D.E. 44 at 2.) This assertion misstates the expert's testimony. Smith did not testify that he never examined the bucket or tablets post-incident. He testified that he did not examine the bucket at the scene of the incident. (D.E. 36-1 at 52.) Smith testified that he examined the subject bucket and the remaining chlorine tablets in 2019. *Id.* at 26. Smith both affirmed and testified that he excluded his original hypotheses after examining the subject bucket in 2019. (D.E. 35-3 ¶ 36; D.E. 36-1 at 25, 104.)

Smith's affidavit is generally consistent with his deposition testimony. The affidavit serves not to defeat the dispositive motion, but to aid the court in its determination. The affidavit's fifty-one paragraphs bring focus to the opinions set forth in Smith's ten-hour, four-hundred-plus page deposition. It is not a sham. *See Winzer*, 916 F.3d at 473 (reaffirming that the sham affidavit doctrine does not apply where an "affidavit supplements, rather than contradicts" an earlier statement).

The court will consider both Smith's expert report and Smith's affidavit in deciding the motion to exclude.

### 5. *Motion to Exclude Expert Testimony*

In their motion to exclude Smith's testimony, Defendants argue that Smith must be excluded as an expert because: (1) he did not test his theories; (2) there is no known rate of error; (3) he did not rely on peer-reviewed literature; and (4) his theories are not accepted within the relevant scientific community.

Ms. Stagg-Shehadeh argues that Smith has the necessary qualifications to be an expert witness. Ms. Stagg-Shehadeh asserts that Smith followed the relevant methodological standards utilized in the fire investigation expert community and did not need to prove that his testimony was factually correct.

## A. *Legal Standard*

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

To be admissible, an opinion must be both reliable and relevant. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). An expert's opinion is considered reliable if "the reasoning or methodology underlying the testimony is scientifically valid." *Id.* An opinion is relevant if the expert's reasoning or methodology can be applied to the facts at issue. *Id.*

The district court's job is to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. A district court must ensure that "there is an adequate 'fit' between the data and the opinion proffered." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

The party that proffers the expert testimony bears the burden of establishing that the testimony is admissible. *Gamboa v. Centrifugal Casting Mach. Co.*, No. CV H-14-1273, 2015 WL 9948807, at *2 (S.D. Tex. May 15, 2015).

## B. *Analysis*

Evidence provided to the court shows that Smith offered three main opinions: (1) water in the bucket reacted with the chlorine tablets and formed gas, which caused the overpressure event that injured Ms. Stagg-Shehadeh; (2) the overpressure event would not have occurred if the chlorine tablets inside the bucket were

individually wrapped; and (3) Defendants did not sufficiently warn consumers against the mechanisms of an overpressure event. (D.E. 34-5 at 4–5.) Smith testified that he was hired to provide an opinion on the cause of the incident. (D.E. 36-1 at 16.) He affirmed that his training and experience focuses on investigating the cause of fire and explosion events. (D.E. 35-3 ¶¶ 4–9.) Smith's training and experience are not in dispute.

## I. *Opinion that water in the bucket reacted with the chlorine tablets, causing the incident*

As to the cause of the incident, Smith testified that his initial theory was that water or organic material entered into the bucket, causing the chlorine tablets inside to oxidize and produce a gas. (D.E. 36-1 at 104.) He theorized that the produced gas built up pressure inside the bucket and that once the pressure inside the bucket grew greater than the ambient pressure outside the bucket, it was forced to escape. (D.E. 35-3 ¶ 41; D.E. 36-1 at 77.) According to Smith, Ms. Stagg-Shehadeh's injuries resulted from the forced escape of gas. (D.E. 36-1 at 45.) In other words, gas built up in the bucket and blew the lid off, which hit Ms. Stagg-Shehadeh in the face and caused her injuries.

For Smith's opinion to be helpful to the jury he must explain not just that an accident happened, but how it happened. He must explain his scientific methodology and apply that methodology to the facts. *Daubert*, 509 U.S. at 592–93. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Smith affirmed that he first used the industry's standard elimination method. (D.E. 35-3 ¶ 42.) In the subject bucket, Smith observed some brown spots on six of the chlorine tablets inside, which were tested for traces of iron. (D.E. 34-5 at 5; D.E. 36-1 at 52.) The testing laboratory did not definitively determine the source of the spots but found that they contained at least some traces of iron. (D.E. 36-1 at 52–53.) Based on this finding and Ms. Stagg-Shehadeh's testimony that she bled, Smith determined that the spots were Ms. Stagg-Shehadeh's blood, introduced to the bucket after the

incident. *Id.* at 53. Smith did not observe any other foreign materials inside the bucket that he believed were present before the incident. *Id.* at 104. He affirmed that "[i]f organic material had reacted with the chlorine, such material would likely still be present in a highly dehydrated state or possibly even charred, and that was not the case." (D.E. 35-3 ¶ 38.) Because he did not observe remnants of organic material, he ruled out the theory that organic material entered into the bucket and reacted with the chlorine tablets. (D.E. 35-3 ¶ 38; D.E. 36-1 at 104.)

After ruling out organic material as the oxidizing source, Smith testified that the only remaining possible source of oxidation was water. (D.E. 36-1 at 104.) Smith ruled out the theory that external water was introduced to the bucket because he "didn't see any melting of [the chlorine tablets] as if liquid had been poured on [them.]" *Id.*

Smith testified that the only remaining explanation was that water vapor entered into the bucket and oxidized with the chlorine tablets. (D.E. 35-3 ¶ 41.) To test this theory, Smith weighed four of the subject chlorine tablets and tested the subject bucket for ventilation. (D.E. 34-5 at 7; D.E. 35-3 ¶ 39.) The weight of the sample chlorine tablets ranged from 219.63 grams to 228.38 grams. (D.E. 34-5 at 7.) Because the tablets were not all the same weight, Smith affirmed that "it was apparent the subject tablets had undergone some mass loss." (D.E. 35-3 ¶ 39.) Upon testing the bucket, Smith found that it was not airtight and thus opined that humid air, full of water vapor, could have entered into the bucket. *Id.* He determined that the mass loss was evidence of "a possible reaction between water vapor and the tablets (resulting in gas evolution) and/or a result of mechanical rubbing of the tablets." *Id.*

The court notes that in both his report and his deposition, Smith opined that the chemical reaction occurred when chlorine tablets were combined with <u>water</u>. (D.E. 35-2 at 4, 6; D.E. 36-1 at 55, 84.) During his deposition, Smith testified that he used the term "water" to refer to condensation. (D.E. 36-1 at 55.) Thus, up until he was questioned by Plaintiff's counsel at his deposition, Smith's opinion appeared to be that the cause of the incident was a chemical reaction that resulted from the combination of chlorine tablets and

liquid water formed by condensation. However, upon questioning by Plaintiff's counsel and then in his post-deposition affidavit, Smith seems to back off from his opinion and states that "water vapor" reacted with the chlorine tablets. (D.E. 35-3 ¶¶ 24, 41; D.E. 36-1 at 104.) He sometimes uses the terms "water vapor" and "condensation" interchangeably in his affidavit, despite the definitional differences. Water vapor is the gaseous state of water, while condensation is the liquid form. *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2003). They are two different things.

While Smith testified that the humidity would have raised the possibility of a chemical reaction because of the hygroscopic[3] nature of the chlorine tablets, he did not unequivocally opine that humidity alone caused the reaction in this case. (D.E. 36-1 at 83, 105.) According to Smith, "[t]he higher the humidity, the more water is available to be pulled out of the air and come in contact with the organic material, thereby raising the possibility of reaction." *Id.* He testified that water vapor was important because "the air containing water on the inside of the vessel [could] then condens[e] into water droplets." *Id.* at 104.

Smith testified that, for water vapor to turn into condensation, the atmosphere's temperature must have matched the dew point. (D.E. 36-1 at 34, 61.) Absent this scientific condition, Smith admitted that condensation could not have formed. *Id.* at 62. Smith's own factual investigation demonstrated that condensation did not form. He gathered weather data for the days prior to the incident and testified that it had been humid. *Id.* at 61. However, he testified that, on the day of the incident and the three days leading up to it, the temperature did not match the dew point at any time. *Id.* at 61–62. In other words, the environmental condition required to support the theory that condensation formed did not exist. Thus the only way for the reaction to have occurred is by virtue of the humidity in the air coming into contact with the tablets. The court notes that Smith

---

[3] Hygroscopic is generally defined as "readily taking up and retaining moisture." Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

cannot explain why these buckets do not explode throughout Houston every summer, given the undeniable humidity that is a common experience. *Id.* at 84.

The court is reluctant to admit Smith's testimony on this point because his opinions seem to be changing over time. He has evolved from saying that condensation would need to have occurred for the subject reaction to occur, to stating that high enough humidity in the air could have caused the incident. This inconsistency is likely enough to exclude the opinion, but, arguably, it is an issue of weight versus admissibility. The court will consider this part of Smith's opinion in its analysis of the summary judgment motion.

II. *Opinion that the incident would not have occurred if the chlorine tablets inside the bucket were individually wrapped*

Smith opined that Defendants' use of unwrapped chlorine tablets constituted an unreasonably dangerous design defect. (D.E. 34-5 at 4–5.) Smith affirmed that, if the bucket was filled with individually wrapped chlorine tablets, the incident probably would not have occurred. (D.E. 35-3 ¶ 46.) He opined that individually wrapped tablets were a safer alternative that Defendants should have utilized. *Id.*

To establish that Defendants' design was defective, Ms. Stagg-Shehadeh must show that wrapped chlorine tablets were a safer alternative to unwrapped tablets and that the unwrapped tablets caused her injury. *See Sims v. Kia Motors of Am., Inc.*, 893 F.3d 393, 400 (5th Cir. 2016) (citing Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)). "An alternative design must substantially reduce the risk of injury and be both economically and technologically feasible." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999). "Texas law expects that an alternative design can be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Sims*, 839 F.3d at 407.

Smith did not perform any physical tests to determine whether the proposed alternative would reduce the risk of injury. (D.E. 36-1 at 58, 60.) He testified that there were too many variables to ever

physically test whether individual wrappings would reduce the risk. *Id.* at 63.

Instead, Smith affirmed that he tested his hypothesis "cognitively" and that this type of testing is generally accepted in his field of expertise. (D.E. 35-3 ¶ 46.) He affirmed that, under the NFPA:

> Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as to the body of scientific knowledge associated with phenomena relevant to the scientific incident . . . . A hypothesis can be tested physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research . . . .

*Id.* ¶ 48.

Smith affirmed he reached his opinion by applying the accepted scientific principle that chlorine reacts with water. (D.E. 35-3 ¶ 50.) As indicated above, the court now takes Smith to mean either liquid or vapor water. He then explained the known facts he relied on: (1) he noted that Defendants and others in the industry sell buckets filled with individually wrapped chlorine tablets; (2) he determined that Defendants could have foreseen the complained-of incident because warnings of a chemical reaction such as the incident at issue were posted on the label of buckets of chlorine tablets; and (3) he observed the proposed wrappings and decided that "it [was] apparent that they provide a measure of protection for each tablet from contaminants." (D.E. 34-5 ¶ 45.) Yet, Smith testified that the wrappings had tiny perforations where water could still enter, make contact, and react with the chlorine tablets. (D.E. 36-1 at 60.) In fact, Smith specifically testified that individual packaging may not be a barrier to water reaching the tablets. *Id.* at 68. Because the proposed wrappings would allow water, whether liquid or vapor, to contact the chlorine tablets, Smith's hypothesis that wrapping the tablets would be safer makes no sense. He opined that the incident occurred because water reached the tablets and did not explain how individual wrappings would change that.

Smith did not point to any scientific data to support his theory that wrapped tablets would substantially reduce the risk of injury. His "opinion [was] predicated on the assumptions [he] provided." (D.E. 36-1 at 64.) This is not enough to ensure reliability of Smith's testimony as to an alternative design. *See Sims*, 839 F.3d at 408 (upholding the exclusion of expert testimony as to an alternative design where the expert relied on another expert's feeling that the alternative was effective but noted that the change did not eliminate the risk complained-of).

### III. *Opinion about the warning label*

As to the warning label affixed to the buckets of chlorine tablets, Smith opined that it "did not sufficiently warn against the mechanisms of the overpressure event." (D.E. 34-5 at 5.)

Defendants argue that Smith's opinion about the products' warning label is irrelevant because Smith lacks the expertise to offer this opinion. Defendants also argue that Smith's opinion is meaningless because the label already includes the exact warnings that Smith suggests. Ms. Stagg-Shehadeh does not specifically address this argument in her response.

Smith testified that he was "not offering opinions as to the adequacy of the warnings." (D.E. 36-1 at 69.) He also testified that he was hired to provide opinions on the cause of the incident. *Id*. at 16. Based on Smith's own admissions, he is not qualified to offer his opinion on the adequacy of the warning label. Ms. Stagg-Shehadeh has not presented evidence to establish that the challenged testimony is admissible.

Smith's opinion on the warning label does not pass muster under Rule 702 and must be excluded.

### 6. *Motion for Summary Judgment*

Defendants move for summary judgment on all of Ms. Stagg-Shehadeh's claims. In Ms. Stagg-Shehadeh's amended complaint, she alleges that Defendants had a duty to design and manufacture a safe product and to adequately warn the public of the potential dangers and risks. Ms. Stagg-Shehadeh asserts these claims (numbered by the court):

(1) Strict liability: failure to warn;

(2) Strict liability: design defect;

(3) Strict liability: manufacturing defect;

(4) Negligence in failing to warn about known dangers;

(5) Negligence in selling the buckets without proper warnings;

(6) Negligence in the testing and inspection of the design;

(7) Negligence in the testing and inspection of the manufacturing process;

(8) Negligence in disregarding principles of hazard control;

(9) Negligence in disregarding obligations to hold the safety of the public paramount;

(10) Negligence in failing to ensure the buckets were reasonably safe for normal and intended use;

(11) Negligence in failing to ensure the buckets were not contaminated by outside sources;

(12) Breach of implied warranty of merchantability; and

(13) Res ipsa loquitor.

(D.E. 9.)

Ms. Stagg-Shehadeh later states that her "primary theory of liability is that Defendants should have individually wrapped the chlorine tablets, which is something Defendants already do." (D.E. 34 at 5.)

In their motion for summary judgment, Defendants argue that FIFRA preempts Ms. Stagg-Shehadeh's claims related to the product's warning label. They also argue that Ms. Stagg-Shehadeh has not presented any evidence that the bucket, the chlorine tablets, or their packaging are negligently designed or manufactured, are unreasonably dangerous, or caused any alleged explosion.

### A. Legal Standard

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting

Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If this burden is met, the nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant must "go beyond the pleadings," using competent summary judgment evidence to cite to "specific facts" showing a genuine issue for trial. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010). Conclusory allegations and unsubstantiated assertions are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

### B. Analysis

In her amended complaint, Ms. Stagg-Shehadeh alleges that the subject bucket of unwrapped chlorine tablets contained a manufacturing defect. In her response to both motions, Ms. Stagg-Shehadeh states that she "consents to the dismissal of her manufacturing defect claim because she is not contending that Defendants' unwrapped chlorine tablets deviated from those tablets' manufacturing specifications." (D.E. 35 at 2 n.1.) She says that she does not oppose the court's dismissal of this claim. (D.E. 34 at 1 n.2.) The court thus recommends that Ms. Stagg-Shehadeh's manufacturing defect claims, claims (3) and (7), be dismissed and focuses its analysis on the remaining claims rooted in design and labeling defects.

Because federal jurisdiction is based on diversity, the substantive law of Texas applies to Ms. Stagg-Shehadeh's claims. *See Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 483, 486 (5th Cir. 2009).

## I. *Preemption, generally*

FIFRA regulates the use, sale, and labeling of pesticides produced and sold in both interstate and intrastate commerce. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 437 (2009). Under FIFRA, all pesticides must be registered with the EPA and the EPA must approve a pesticide's labeling and packaging. 7 U.S.C. §§ 136(b), 136a(a); 40 C.F.R. §§ 152.15, 152.112(f) (2021). The EPA maintains strict requirements as to the labeling of pesticides. 40 C.F.R. §§ 156.3–156.212 (2021). If a product's labeling or packaging is subject to FIFRA, a state may not impose a requirement for labeling or packaging that differs from the federal requirement. 7 U.S.C. § 136v(b).

Leslie's Director of Safety and Regulatory Affairs affirmed that the chlorine tablets it sells are pesticides subject to FIFRA. (D.E. 32-5 ¶ 2.) The EPA approved the labels affixed to the relevant buckets of chlorine tablets. *Id.* ¶ 4.

The majority of Ms. Stagg-Shehadeh's response to the motion for summary judgment is spent reciting the *Bates* opinion. (D.E. 34 at 6–13.) In *Bates*, the Supreme Court interpreted FIFRA as preempting only state rules that imposed labeling or packaging *requirements* that *differed from* federal requirements. 544 U.S. at 444. "The proper inquiry calls for an examination of the elements of the common-law duty at issue." *Id.* at 445. State requirements that are equivalent to or consistent with federal requirements are not preempted. *Id.* at 447.

The parties appear to be talking past each other on this issue. Ms. Stagg-Shehadeh is raising Texas common law claims. Neither party has explained how Texas common law might impose labeling requirements beyond those required by federal law. In any event, as discussed next, Ms. Stagg-Shehadeh's Texas common law claims fail on the merits, preemption notwithstanding. Neither party contends that the remaining claims are preempted. They are not. *See Bates*, 544 U.S. at 444.

## II. *Alleged defects in labeling*

In her amended complaint, Ms. Stagg-Shehadeh alleges that Defendants knew that buckets of chlorine tablets were unreasonably

dangerous yet failed to warn the public about the risk of explosion. (D.E. 9.) She asserts that, if she had been warned of the risks associated with the use and handling of the product, she would not have used it.

Defendants argue that the warning label already contains the exact warning that Ms. Stagg-Shehadeh asserts should be visible. They also argue that Ms. Stagg-Shehadeh conceded that she had no recollection of reading the label, so a change in the affixed warnings would not have prevented the incident.

Defendants have shown that no rational jury could find for Ms. Stagg-Shehadeh under Texas law. To establish a failure-to-warn cause of action in Texas, a plaintiff must show that the warning in question was defective and that the failure to warn caused the plaintiff's injury. *Hale v. Metrex Rsch. Corp.*, 963 F.3d 424, 428 (5th Cir. 2020). "[A]n essential element of a failure-to-warn claim is that 'the absence of a warning or instructions renders the product unreasonably dangerous.'" *Id.* (quoting *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 504 (Tex. App.—Eastland 2002, pet. denied)). Thus, a warning is adequate as a matter of law if it specifically addresses the complained-of circumstances. *Id.*

The warning at issue states:

> Contamination with moisture, organic material or other chemicals may start a chemical reaction with generation of heat, liberation of hazardous gases and possible fire or explosion.

(D.E. 32-4 at 2.) It specifically warns that moisture may react with the chlorine tablets and the resulting release of gases may cause an explosion. Ms. Stagg-Shehadeh does not state what portion of this warning she believes to be insufficient or explain what she believes should be added. The warning addresses the very condition that occurred. The label addresses the risk of explosion and is adequate as a matter of law. Thus, the warning label was not defective and Defendants were not negligent in providing warnings and are not strictly liable for failing to warn.

Moreover, Ms. Stagg-Shehadeh has not provided evidence to show that the warning label or Defendants' failure to warn caused her

injury. Ms. Stagg-Shehadeh testified that she had no memory of reading the warning prior to the incident. (D.E. 32-10 at 5.) The actual warning label thus had no bearing on her interaction with the bucket of unwrapped chlorine tablets. Accordingly, Ms. Stagg-Shehadeh cannot prevail on her common-law failure-to-warn claims, claims (1), (4), and (5).

### III. *Alleged defects in design*

In her amended complaint, Ms. Stagg-Shehadeh alleges that the buckets of unwrapped chlorine tablets were defectively designed and that the defect caused her injury. She asserts that the unwrapped tablets were unreasonably dangerous and that their risk of danger outweighed their benefits. She also asserts that Defendants failed to exercise reasonable care in designing, testing, and inspecting the product, which was not fit for its intended use. According to Ms. Stagg-Shehadeh, these allegations form the basis for all three theories of her design defect claims against Defendants: strict liability (2), negligence (6, 10, 13), and breach of implied warranty of merchantability (12). (D.E. 34 at 12.)

### a. *Strict liability*

"To make out a strict liability cause of action, a party must establish that: (1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user." *Romo v. Ford Motor Co.*, 798 F. Supp. 2d 798, 806 (S.D. Tex. 2011) (quoting *Syrie v. Knoll Int'l*, 748 F.2d 304, 306 (5th Cir. 1984)); *see* Tex. Civ. Prac. & Rem. Code Ann. § 82.005.

In her amended complaint, Ms. Stagg-Shehadeh asserts that the unwrapped chlorine tablets found in the subject bucket were unreasonably dangerous. Defendants argue that the unwrapped tablets are not unreasonably dangerous as a matter of law.

Whether a design is unreasonably dangerous may be determined as a matter of law if reasonable minds could not differ. *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011).

Courts consider several factors in determining whether a design is unreasonably dangerous:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; (5) the expectations of the ordinary consumer.

*Id.* (quoting *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex. 1999)). "[N]o single factor needs to be proven on its own, so long as all factors working together point to a finding of unreasonable dangerousness." *Id.* at 1041.

Defendants point to several facts that support finding that the unwrapped tablets are not unreasonably dangerous:

- unwrapped tablets are a standard option in the pool chemical industry (D.E. 32-2 ¶ 5);
- chlorine has been used as a pool sanitizer for over 100 years (D.E. 32-2 ¶ 5); and
- Mr. Shehadeh used the same or similar chlorine tablets consistently from 2010 through 2017 (D.E. 33-4 at 3).

Not only did Mr. Shehadeh use similar chlorine tablets in the past, he used unwrapped chlorine tablets from the subject bucket on the morning of the incident. (D.E. 33-4 at 6.) Mr. Shehadeh was not injured by his encounter with the same bucket of unwrapped chlorine tablets on the same day that the incident occurred.

Upon review of the record, it is also clear that Mr. Shehadeh was aware of the dangers when he purchased buckets of unwrapped chlorine tablets. He testified that he had "absolutely" read the warnings on buckets of chlorine tablets and repeated some of these

during his deposition: "Do not leave in high temperatures and store it properly . . . away from water, closed, away from children. They had hazards on there as well." (D.E. 33-4 at 5.) Mr. Shehadeh also testified that a friend verbally warned him that water or chemicals could "activate" the chlorine tablets and "cause fire." *Id.* at 7.

In addition, Leslie's Vice President of Risk Management affirmed that the company has been selling chlorine tablets for over almost fifty years. (D.E. 32-2 ¶ 4.) He affirmed that hundreds of thousands of customers have safely used these products for their intended purpose. *Id.* The company's Director of Safety and Regulatory Affairs affirmed that their chlorine tablets have been registered with the EPA since at least 1979. (D.E. 32-5 ¶¶ 2, 4.)

The summary judgment evidence shows that people have safely benefited from these products for decades and users have realistic expectations about the products and understand the inherent dangers of usage. Mr. Shehadeh knew about the associated dangers and was able to avoid them for seven years while he continued to purchase similar products. He was even able to avoid these dangers while using the exact bucket that allegedly caused his wife's injuries on the exact same day.

In her amended complaint, Ms. Stagg-Shehadeh asserts that wrapped chlorine tablets are a safer alternative to unwrapped chlorine tablets. Defendants argue that Ms. Stagg-Shehadeh has not presented admissible evidence that wrapped tablets are safer.

"A safer alternative design is one that would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time." *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015); *see* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b). Other courts have granted summary judgment in favor of defendants in cases where admissible expert testimony was not available to support a proposed safer alternative design. *Norman v. Grove Cranes U.S., LLC*, 750 F. App'x 269, 273 (5th Cir. 2018) (collecting cases). "A design is not a safer alternative if, under other circumstances, [it would] impose an equal or greater risk of harm than the design at

issue." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 331 (5th Cir. 2014) (alteration in original).

Ms. Stagg-Shehadeh has not offered any admissible evidence of a safer alternative design. In her response to the motion for summary judgment, Ms. Stagg-Shehadeh acknowledged that Smith's testimony is necessary to show that a reasonably safe alternative design existed. (D.E. 34 at 2, 13.) She accepted that, without this testimony, she failed to present a genuine issue of material fact as to her strict liability design defect cause of action. *Id.*

Reviewing all factors together based on the evidence presented in this case, Defendants have met their summary judgment burden to show that the product is not unreasonably dangerous. *See Wilson v. Recreational Water Prod., Inc.*, No. CV-12-J-2721-NE, 2014 WL 223062, at *5 (N.D. Ala. Jan. 21, 2014) (noting that evidence that plaintiff used chlorine tablets from the subject bucket several times before the incident in question belied plaintiff's claim that the bucket of tablets was unreasonably dangerous as sold). Ms. Stagg-Shehadeh has not presented a dispute of material fact to show that buckets of unwrapped chlorine tablets are unreasonably dangerous.

### b. *Negligence*

To recover under a theory of negligence, Ms. Stagg-Shehadeh must show that (1) Defendants owed her a legal duty; (2) Defendants breached that duty; (3) Ms. Stagg-Shehadeh was injured as a result of Defendants' breach; and (4) the breach of duty was the proximate cause of her injuries. *Hayles v. Gen. Motors Corp.*, 82 F. Supp. 2d 650, 658 (S.D. Tex. 1999). "The care taken by the supplier of a product in its preparation, manufacture, or sale is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the act of the manufacturer and determines if it exercised ordinary care in design and production." *Romo*, 798 F. Supp. 2d at 807 (quoting *Syrie*, 748 F.2d at 307). However, where evidence is directly tied to the issue of whether the product was unreasonably dangerous and a plaintiff offers no evidence as to other potentially negligent conduct in the design of the

product, the absence of a defect negates an essential element of the negligence claim. *Hayles*, 82 F. Supp. 2d at 658–59 (citing *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir. 1988)).

Ms. Stagg-Shehadeh does not give details about what negligent things she believes Defendants did or did not do. She alleges that Defendants negligently tested and inspected the design (6) and failed to ensure that the buckets were reasonably safe (10). Like her strict liability design claim, to prevail on these negligence claims, Ms. Stagg-Shehadeh would again need to show a defect in the design that rendered the product unreasonably dangerous and establish that the defective design was the proximate cause of her injuries. "[A]lthough a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective because: (1) if a product is not unreasonably dangerous because of the way it was manufactured, it was not negligent to manufacture it that way and (2) even if the manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product 'unreasonably dangerous.'" *Garrett*, 850 F.2d at 257. As discussed above, Ms. Stagg-Shehadeh has not presented evidence that the bucket of unwrapped chlorine tablets was unreasonably dangerous.

Ms. Stagg-Shehadeh argues that causation is evident from the simple fact that the incident occurred. She thus invokes the theory of res ipsa loquitur, which she also asserts as its own separate claim (13). Res ipsa loquitur is not a rule of substantive law but a rule of evidence. *Hayles*, 82 F. Supp. 2d at 659. The theory of res ipsa loquitur allows a jury to infer that a defendant is liable absent evidence that a breach of duty caused the plaintiff's injury. *Pearson v. BP Prods. N. Am., Inc.*, 449 F. App'x 389, 391 (5th Cir. 2011). The theory only applies if "(1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant." *Id.* (quoting *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990)).

Res ipsa loquitor does not apply to Ms. Stagg-Shehadeh's situation. For the theory to apply, Ms. Stagg-Shehadeh would need to show that Defendants maintained exclusive control over the bucket of chlorine tablets. That control would thus eliminate other potential causes of contamination. Defendants argue that the subject bucket of unwrapped chlorine tablets was not in their control at the time of the incident. Mr. Shehadeh testified that he purchased the subject bucket of chlorine tablets sometime in the three to four weeks prior to the incident. (D.E. 33-4 at 3.) During that time, Mr. Shehadeh—not Defendants—controlled and managed the bucket. Ms. Stagg-Shehadeh has not presented any facts to show that the subject bucket was defective when Mr. Shehadeh purchased it. Res ipsa loquitur does not apply. *See Allstate Ins. Co. v. Pooltime Prods., Inc.*, 846 F. Supp. 499, 501 (E.D. La. 1994) (granting summary judgment where the plaintiff failed to show that chlorine tablets were defective when they left the pool supply store and finding that res ipsa loquitur was not applicable to the facts).

Ms. Stagg-Shehadeh did not present conflicting evidence. Ms. Stagg-Shehadeh's argument instead focuses on the first element needed for res ipsa loquitor. Her argument is that, but for a breach of duty, the incident would not have occurred. However, "Texas law does not generally recognize a product failure standing alone as proof of a product defect." *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 837 (S.D. Tex. 2013).

Ms. Stagg-Shehadeh has not presented a dispute of material fact and cannot prevail on her negligence claims (6), (10), and (13).

### c. *Breach of implied warranty of merchantability*

Under Texas law, merchantable goods or products must be "fit for the ordinary purposes for which such goods are used." Tex. Bus. & Com. Code Ann. § 2.314(b)(3). To prevail on a claim for breach of implied warranty of merchantability, a plaintiff must prove a defect in the condition of the products "that renders them unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy." *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989). Ms. Stagg-Shehadeh argues that her breach of

implied warranty is "akin to a design defect claim." (D.E. 34 at 12.) She alleges that the subject chlorine tablets were not fit for their intended use because they were unreasonably dangerous. As discussed above, Ms. Stagg-Shehadeh has not shown that the bucket of chlorine tablets was unreasonably dangerous. Ms. Stagg-Shehadeh has not presented a dispute of material fact and cannot prevail on her implied warranty claim (12).

## IV.  *Remaining negligence claims*

Ms. Stagg-Shehadeh's remaining claims include: negligence in disregarding principles of hazard control (8); negligence in disregarding obligations to hold the safety of the public paramount (9); and negligence in failing to ensure the buckets were not contaminated by outside sources (11). Neither party substantially addresses these claims. Because the underlying cause of action is negligence, Ms. Stagg-Shehadeh would again have to establish causation to prevail at trial. As with her other negligence claims, Ms. Stagg-Shehadeh has not demonstrated that a defect in the product caused her injuries. Accordingly, she cannot prevail on her remaining negligence claims, claims (8), (9), and (11).

Defendants are entitled to summary judgment.

*7. Conclusion*

Defendants' motion to exclude expert testimony (D.E. 33) is GRANTED in part and DENIED in part. Because there is no genuine issue of material fact as to any of Ms. Stagg-Shehadeh's claims, the court recommends that Defendants' motion for summary judgment (D.E. 32) be GRANTED.

The parties have fourteen days from service of this memorandum and recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn,* 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas, on May 26, 2021.

_____
Peter Bray
United States Magistrate Judge